NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY
CAMDEN VICINAGE

---

TARA ARSLANIAN o/b/o
JOHNNY ARSLANIAN (deceased),

        Plaintiff

    v.

ANDREW SAUL,
COMMISSIONER OF SOCIAL
SECURITY,

        Defendant

Civ. No. 19-13258 (RMB)

**OPINION**

---

APPEARANCES:

Stephen Guice, Esq.
Law Offices of Stephen Guice, P.C.
413 Clements Bridge Road
Barrington, N.J. 08007
      On behalf of Plaintiff

Brittany Johanna Gigliotti, Esq. and
Shannon G. Petty, Esq.
Social Security Administration
Office of the General Counsel
300 Spring Garden Street, 6th Floor
Philadelphia, PA 19123
      On behalf of the Commissioner of Social Security

RENÉE MARIE BUMB, United States District Judge

    This matter comes before the Court upon Plaintiff Tara Arslanian's (o/b/o Johnny Arslanian (deceased) ("Plaintiff")) appeal of the denial of her husband Johnny Arslanian's application for social security disability benefits by the Commissioner of Social Security. ("Commissioner.") Plaintiff contends that Johnny

Arslanian was disabled by Acute Disseminated Encephalomyelitis ("ADEM")[1] and chronic back pain. For the reasons set forth herein, the Court will affirm the Commissioner's final decision.

I. PROCEDURAL HISTORY

On March 1, 2016, Mr. Arslanian filed applications for supplemental security income and disability insurance benefits,

---

[1] According to the National Institute of Neurological Disorders and Stroke:

> Acute disseminated encephalomyelitis (ADEM) is characterized by a brief but widespread attack of inflammation in the brain and spinal cord that damages myelin – the protective covering of nerve fibers. ADEM often follows viral or bacterial infections, or less often, vaccination for measles, mumps, or rubella. The symptoms of ADEM appear rapidly, beginning with encephalitis-like symptoms such as fever, fatigue, headache, nausea and vomiting, and in the most severe cases, seizures and coma. ADEM typically damages white matter (brain tissue that takes its name from the white color of myelin), leading to neurological symptoms such as visual loss (due to inflammation of the optic nerve) in one or both eyes, weakness even to the point of paralysis, and difficulty coordinating voluntary muscle movements (such as those used in walking). ADEM is sometimes misdiagnosed as a severe first attack of multiple sclerosis (MS), since the symptoms and the appearance of the white matter injury on brain imaging may be similar.… Corticosteroid therapy typically helps hasten recovery from most ADEM symptoms. The long-term prognosis for individuals with ADEM is generally favorable.

Available at
https://www.ninds.nih.gov/disorders/all-disorders/acute-disseminated-encephalomyelitis-information-page

alleging disability beginning November 30, 2013. (A.R. 1006-19.)
Mr. Arslanian's claim was denied initially on April 25, 2016, and
denied upon reconsideration on June 28, 2016. (A.R. 856-895.)
Administrative Law Judge ("ALJ") Shawn Bozarth presided over the
disability hearing on (A.R., 828-55.) Tara Arslanian, the
deceased's wife, and a Vocational Expert ("VE"), Julie A. Harvey,
testified at the hearing. (Id.)

Following the administrative hearing, on June 27, 2018, the
ALJ issued a decision denying Plaintiff's claims. (A.R., 807-25.)
On April 2, 2019, the Appeals Council denied Plaintiff's request
for review, rendering the ALJ's decision final. (A.R., 1-6.)
Plaintiff's appeal is presently before this Court.

II. STANDARD OF REVIEW

When reviewing a final disability determination by an ALJ, a
court must uphold the ALJ's factual decisions if they are supported
by "substantial evidence." Hess. v. Comm'r Soc. Sec., 931 F.3d
198, n. 10 (3d Cir. 2019) (quoting Chandler v. Commissioner of
Social Sec., 667 F.3d 356, 359 (2011) (citation omitted)); 42
U.S.C. §§ 405(g), 1383(c)(3). "Substantial evidence" means "'more
than a mere scintilla. It means such relevant evidence as a
reasonable mind might accept as adequate to support a conclusion.'"
Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Cons.
Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)); Albert Einstein
Med. Ctr. v. Sebelius, 566 F.3d 368, 372 (3d Cir. 2009) (same). In

addition to the "substantial evidence" inquiry, the court must also determine whether the ALJ applied the correct legal standards. Friedberg v. Schweiker, 721 F.2d 445, 447 (3d Cir. 1983); Sykes v. Apfel, 228 F.3d 259, 262 (3d Cir. 2000). The Court's review of legal issues is plenary. Hess, 931 F.3d at n. 10 (citing Chandler, 667 F.3d at 359)).

The Social Security Act ("SSA") defines "disability" as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). The Act further states,

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B).

The Commissioner has promulgated a five-step, sequential analysis for evaluating a claimant's disability, as outlined in 20 C.F.R. § 404.1520(a)(4)(i-v). The claimant bears the burden of proof at steps one through four, and the burden shifts to the

4

Commissioner at step five. Hess, 931 F.3d at 201 (citing Smith v. Comm'r of Soc. Sec., 631 F.3d 632, 634 (3d Cir. 2010)). The Supreme Court described the ALJ's role in the Commissioner's inquiry at each step of this analysis:

> At step one, the ALJ determines whether the claimant is performing "substantial gainful activity." 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i). If he is, he is not disabled. *Id.* Otherwise, the ALJ moves on to step two.
>
> At step two, the ALJ considers whether the claimant has any "severe medically determinable physical or mental impairment" that meets certain regulatory requirements. *Id.* §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). A "severe impairment" is one that "significantly limits [the claimant's] physical or mental ability to do basic work activities." *Id.* §§ 404.1520(c), 416.920(c). If the claimant lacks such an impairment, he is not disabled. *Id.* §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). If he has such an impairment, the ALJ moves on to step three.
>
> At step three, the ALJ decides "whether the claimant's impairments meet or equal the requirements of an impairment listed in the regulations[.]" *Smith*, 631 F.3d at 634. If the claimant's impairments do, he is disabled. 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). If they do not, the ALJ moves on to step four.
>
> At step four, the ALJ assesses the claimant's "residual functional capacity" ("RFC") and whether he can perform his "past relevant work." *Id.* §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv). A claimant's "[RFC] is the most [he] can still do despite [his] limitations." *Id.* §§ 404.1545(a)(1), 416.945(a)(1). If the claimant can perform his past relevant work despite his limitations, he

is not disabled. *Id.* §§ 404.1520(a)(4)(iv),
416.920(a)(4)(iv). If he cannot, the ALJ moves
on to step five.

At step five, the ALJ examines whether the
claimant "can make an adjustment to other
work[,]" considering his "[RFC,] ... age,
education, and work experience [.]" *Id.* §§
404.1520(a)(4)(v), 416.920(a)(4)(v). That
examination typically involves "one or more
hypothetical questions posed by the ALJ to [a]
vocational expert." *Podeworny v. Harris*, 745
F.2d 210, 218 (3d Cir. 1984). If the claimant
can make an adjustment to other work, he is
not disabled. 20 C.F.R. §§ 404.1520(a)(4)(v),
416.920(a)(4)(v). If he cannot, he is
disabled.

Hess, 931 F.3d at 201-02.

III. FACTUAL BACKGROUND

A.   Administrative Hearing

The Court recites only the facts that are necessary to its
determination on appeal. Plaintiff was 38-years old on the alleged
disability onset date of November 30, 2013. (A.R., 856.) He had a
college education and work history as a car painter. (A.R., 835,
843, 1054-55.) Mr. Arslanian died of cardiac arrest on March 16,
2016. (A.R., 865.)

At the hearing before the ALJ, Tara Arslanian testified that
her husband worked his whole life as a car painter and worked hard
until he began to exhibit symptoms of lethargy, confusion, slurred
speech, and imbalance. (A.R., 835.) As a result of these symptoms,
he was evaluated with a CT scan that showed lesions on his brain,
which led to exploratory brain surgery. (A.R., 835-36.) He was

diagnosed with ADEM, inflammation in the brain. (A.R., 836.) According to Plaintiff, the condition caused Mr. Arslanian to suffer personality change, loss of dexterity, loss of impulse control, and psychotic episodes. (A.R., 836.) Despite therapy, he never fully recovered. (A.R., 836-37.) He tried to return to employment but needed assistance every step of the way. (A.R., 837.) Everything about him changed and never improved. (A.R., 837.) When doctors could not help him, he became depressed and started making bad choices, his wife asked him to move out because he was a danger to himself and their children. (A.R., 838.) He was homicidal and suicidal. (A.R. 838.) Mr. Arslanian moved in with his mother. (A.R., 838.)

Mr. Arslanian died of cardiac arrest. (A.R., 838.) Plaintiff talked to the medical examiner, who told her Mr. Arslanian's cardiac arrest was the result of his brain condition. (A.R., 838.) Plaintiff testified that her husband had a history of substance abuse, but she felt his brain condition caused his lack of impulse control. (A.R., 840.) This caused him to make poor choices, she opined, although he had been sober for eight years prior to his brain impairment. (A.R., 840.)

### B. Medical History

In November 2013, Mr. Arslanian started experiencing symptoms of forgetfulness, lethargy, and extreme fatigue, sleeping up to 23 hours. (A.R., 711.) He had a history of heroin abuse eight years

earlier; and he was taking suboxone and had recently used cocaine. (A.R., 711.) A brain CT scan, performed on November 29, 2013, showed lesions on his brain. (A.R., 711.) He underwent a series of MRI and CT brain scans. (A.R., 439, 441, 443, 452, 686.) On December 7, 2013, he underwent a biopsy at Jefferson Hospital, which led to his diagnosis of Acute Disseminated Encephalomyelitis. ("ADEM.") (A.R., 334, 405, 439.) Mr. Arslanian later reported that he was told his ADEM was caused by contaminated cocaine. (A.R., 1240.)

For ADEM, Mr. Arslanian was treated with steroids followed by occupational therapy. (A.R. 597.) The MRI of his brain, performed on December 14, 2013 prior to his discharge from Jefferson Hospital, showed hemorrhage along the biopsy tract and biopsy site and "interval hyperintense T1 signal within the right basal ganglia region, most compatible with hemorrhage." (A.R., 686.) When his inpatient occupational therapy concluded on December 16, 2013, he had made slow gains but remained limited in cognition (memory, attention, safety awareness, orientation), balance, and coordination. (A.R., 426.) Continued outpatient occupational therapy was recommended. (A.R., 426.) Multiple sclerosis remained a differential diagnosis, and he was instructed to follow up in neurology. (A.R. 15-16.)

Mr. Arslanian had also been treated for back pain while at Jefferson Hospital. An MRI of his cervical spine, performed on

December 13, 2013, showed advanced disc dessication at C4-C5 and C5-C6, and disc protrusion at C4-C5 that abutted but did not compress the spinal cord, and there was a small protrusion or osteophyte complex at C5-C6. (A.R. 685-86.)

On February 4, 2014, Mr. Arslanian went to a hospital for treatment of his back pain, which had lasted for three weeks. (A.R., 1121.) He complained of low back pain radiating to his mid back and legs but without numbness or weakness. (Id.) He had been taking Tylenol, Motrin, and Tramadol with no relief. (Id.)

The treating physician, Dr. Lawyer, called Dr. Alam, the neurosurgeon who had released Mr. Arslanian from Jefferson Hospital after his treatment for ADEM. (A.R. 1121-22.) Dr. Alam told Dr. Lawyer that from her standpoint, Mr. Arslanian had a full course of steroids and would not require any more workup or treatment for ADEM, and that her last examination of him was benign. (A.R. 1122.) Dr. Alam also indicated that the MRI of Mr. Arslanian's cervical spine was negative for lesions or abnormalities. (Id.) Dr. Lawyer recommended that Mr. Arslanian have another MRI, but he declined due to his anxiety. (Id.) Dr. Lawyer prescribed prednisolone and a Lidoderm patch for pain management. (Id.)

On March 6, 2014, Mr. Arslanian saw Dr. Kernis for follow up. (A.R. 1191-93.) Mr. Arslanian was feeling better after being started on Neurontin for pain two weeks prior, but he reported

9

that he felt his best, with respect to his back pain, depression, and anxiety, when he took Xanax. (A.R., 1191.) He did not report neurologic symptoms, but he complained of worsening depression, moderate anxiety, and sleep disturbance. (A.R., 1192.) His neurological examination was unremarkable and his gait was normal. (Id.) Dr. Kernis prescribed Xanax. (A.R., 1193.)

Mr. Arslanian underwent another brain MRI on March 26, 2014. (A.R. 561-62.) The MRI showed moderate white matter changes and other small areas of signal abnormalities. (A.R., 561.) The interpreting physician concluded there were a "combination of findings including changes related to demyelinating disease, previous injury, and previous surgery." (A.R., 562.) A follow-up MRI was recommended to watch for changes. (Id.)

On May 6, 2014, Mr. Arslanian saw Dr. Abash for medication refills. (A.R., 1189.) Mr. Arslanian reported that he had been in a motor vehicle accident on April 22, 2014, when he struck a telephone pole while driving 60 m.p.h. in a suicide attempt. (A.R., 1189.)[2] Mr. Arslanian admitted to suffering severe anxiety, for which he was taking Seroquel, Neurontin, Cymbalta, and trazadone. (A.R., 1189.) On examination, his general appearance was pleasant,

_____

[2] On another occasion, Mr. Arslanian reported that he had been involved in over 20 motor vehicle accidents, many of which were due to substance abuse. (A.R., 1239.)

alert, and oriented. (A.R., 1189.) His neurologic examination was unremarkable. (A.R., 1189-90.)

On June 10, 2014, Mr. Arslanian went to Jefferson Hospital, accompanied by his wife. (A.R., 631-32.) His wife reported that he had been suffering from headaches, light sensitivity, hallucinations, and his gait was unsteady. (A.R., 632.) On exam, he appeared alert, oriented, and well-nourished. (A.R., 632.) Mr. Arslanian said that his last use of alcohol and marijuana was 40 days ago, with prior intermittent cocaine use. (A.R., 635.) After comparing his December 14, 2013 brain scan to his current brain scan, no acute changes were seen and hypo-attenuated areas were decreased. (A.R., 637.) Dr. Nicole Mahd opined that Mr. Arslanian's symptoms could be caused by his new psychiatric medications and the fact that he stopped taking suboxone, but she also recommended follow up in neurosurgery with Dr. Alam. (A.R., 648.) He was discharged with an MRI scheduled for June 20, 2014. (A.R., 645.)

Mr. Arslanian underwent a brain MRI on July 11, 2014. (A.R., 564-65.) Based on the MRI, Dr. Shah concluded: "unchanged foci of T2 hyperintensity, predominantly in a periventricular distribution. Partial collapse of the right parietal cavity with minimal peripheral enhancement. No acute findings or adverse change." (A.R., 565.)

Ten months later, on May 8, 2015, Mr. Arslanian saw Dr. Kernis for a check-up. (A.R., 1164.) He had been admitted to the hospital

for a drug overdose fifty days earlier. (A.R., 1164.) He had been abusing drugs for four months and was recently diagnosed with hepatitis C. (Id.) While abusing drugs, he took his medications only occasionally. (Id.) Now that he was in rehabilitation, he had been taking his medications for one month. (Id.) On examination, he was neurologically intact. (A.R., 1165, 1166.) He complained of fatigue but did not endorse dizziness. (A.R., 1165.) Dr. Kernis was concerned about possible interactions between his medications, especially with his liver disease, and she urged him to follow up with a psychiatrist. (A.R., 1167.)

On July 2, 2015, Mr. Arslanian went to a hospital after suffering a new onset seizure. (A.R., 1287-1289.) He was released with a prescription for Keppra and instructions to follow up with Jefferson Neurology Associates. (Id.)

When he sought treatment for headaches on December 21, 2015, Mr. Arslanian was evaluated with a brain CT scan. (A.R., 1148-49.) The findings included: underlying postsurgical changes including encephalomalacia,[3] unchanged from the prior exam, and very subtle

---

[3] According to the National Center for Biotechnology Information (NCBI), encephalomalacia is "softening or loss of brain tissue following cerebral infarction; cerebral ischemia, infection, craniocerebral trauma, or other injury." Available at https://www.ncbi.nlm.nih.gov/mesh?Cmd=DetailsSearch&Term=%22Encephalomalacia%22%5BMeSH+Terms%5D%20

asymmetric hypodensity within the left posterior limb internal capsule. The interpreting physician opined:

> stable postsurgical changes compared to the previous exam. Very subtle hypoattenuation within the left posterior limb internal capsule could be artifact.[4] MRI can be obtained if clinically indicated. No evidence of an acute hemorrhage, midline shift, mass effect or extra-axial fluid collection. Continued symptoms warrants a follow up exam.

(A.R., 1149.)

On January 20, 2016, Mr. Arslanian was admitted to Inspira Hospital because he had suicidal impulses to jump in front of a car, with symptoms of depression, and decrease in sleep, appetite, energy, and motivation. (A.R., 1222.) He had reportedly attempted to shoot himself in January 2015. (A.R., 1243.) Upon admission, he was restarted on Cymbalta, Neurontin, and Seroquel, for which he had been noncompliant due to a lapse in insurance coverage. (A.R.,

---

[4] See https://radiopaedia.org/articles/radiological-image-artifact?lang=us

> Most artifacts in radiology refer to something seen on an image that are not present in reality but appear due to a quirk of the modality itself. Artifact is also used to describe findings that are due to things outside the patient that may obscure or distort the image, e.g. clothing, external cardiac monitor leads, body parts of carer, etc.

> The commonest artifact seen in radiology is image noise, which is inherent to every modality and technique, and can be mitigated but never eliminated.

1222.) Mr. Arslanian feared he would soon be sentenced to prison for five to ten years for burglary, which he did not remember committing. (A.R., 1222, 1240.) He attributed his loss of memory to being "high on Xanax." (A.R., 1240.) He had been separated from his wife and children since August 2014, and was living with his mother. (Id.) He was living off his savings. (Id.) By self-report, he continued to use alcohol twice a month, marijuana once a month, and cocaine "here and there," with his last use one month ago. (Id.) He said that his doctors suspected contaminated cocaine had been the cause of his ADEM. (Id.)

Plaintiff complained of having chronic headaches and "the shakes," as well as bulging discs that caused chronic back pain. (A.R., 1241.) On physical exam, he was well-nourished and in no acute distress. (Id.) His gait was steady, with no focal deficits on neurological exam. (Id.) His mental status examination was normal with the following exceptions, he endorsed homicidal thoughts that he would not act upon, continued suicidal thoughts, his affect was odd, his mood was depressed, and his judgment was fair to poor. (Id.) During his 10-day hospital stay, he endorsed gradual improvement in his mood and resolution of suicidal ideation. (A.R. 1222.) Upon discharge, he was alert and oriented, without suicidal or homicidal ideation, hallucinations, or delusional thinking. (A.R., 1223.)

14

Mr. Arslanian visited RA Pain Management Services on March 4, 2016, for his low back pain. (A.R., 1255.) Objective findings upon examination included moderate lumbar spine tenderness; moderate restriction of low back extension and right and left flexion; hyperextension test for pain was positive, and he exhibited a mild to moderate antalgic gait. (A.R., 1257, 1258.) He was neurologically intact, and his muscle strength, tone, and sensory exams were normal. (A.R., 1258.) Dr. Medvedovsky's assessment was of low back pain, muscle spasm, and major depressive disorder. (Id.) He acknowledged Mr. Arslanian's complex medical history with ADEM, substance abuse, and multiple suicide attempts. (Id.) He hoped that if Mr. Arslanian's depression and anxiety were better managed, he would be more physically active, which was recommended to alleviate his back pain. (Id.)

On March 16, 2016, Mr. Arslanian was brought to Jefferson University Hospital, suffering from cardiac arrest. (A.R., 1268.) The medical record from the hospital indicated that his cardiac arrest was "associated with overdose." (Id.) Mr. Arslanian died within an hour of his arrival at the hospital. (Id.) On the death certificate, the cause of death was recorded as "cardiac arrest, unspecified causes." (A.R., 865.)

C. The ALJ's Decision

Following the administrative hearing, the ALJ concluded that Mr. Arslanian was not disabled under the meaning of the SSA. (A.R.,

15

820.) At step one of the sequential analysis, the ALJ determined
that Mr. Arslanian had not engaged in substantial gainful activity
after November 30, 2013, the alleged onset date. (A.R., 813.) At
step two, the ALJ determined that Mr. Arslanian had the following
severe impairments: degenerative disc disease in the lumbar spine,
osteopenia, history of polysubstance abuse disorder,[5] depression,
and anxiety. (Id.) The ALJ also found that Mr. Arslanian was
diagnosed with ADEM, seizure and hepatitis C, but these
impairments, singly or in combination, did not cause more than
minimal functional limitations and were, therefore, not severe
impairments. (Id.) In arriving at this determination, the ALJ cited
the following evidence:

> In February 2014, treating neurosurgeon Dr.
> Alam, indicated the claimant completed a
> full course of steroids from his ADEM and that
> he did not require any more workup or
> treatment (Ex. 1F/9). She also indicated her
> examination of the claimant was benign (Ex.
> 1F/9). Medical imaging of the brain in
> December 2015, post, parietal craniotomy
> showed no evidence of an acute hemorrhage,
> midline shift, mass effect, or extra-axial
> fluid collection (Ex. 1F/36). As for his
> seizure disorder, there is no indication in
> the record indicating the frequency of the
> claimant seizures or that he had any
> significant problems with his seizures (Ex.
> 5F/14). The record only contains hospital
> discharge records from July 2015, which

---

[5] Although the ALJ found that Mr. Arslanian had a history of
polysubstance abuse, he acknowledged that there were periods of
relapses during the relevant time period. The parties did not raise
any issue concerning the ALJ's analysis of Mr. Arslanian's
substance abuse disorder.

> indicate the claimant had a new onset of
> seizures and that he was placed on Keppra (Ex.
> 5F/14). Likewise, with regard to his
> hepatitis C, the record only indicates the
> claimant was diagnosed with hepatitis C
> associated with his IV heroin use and that he
> was being followed by a gastroenterologist
> (Ex. 1F/49). There is nothing in the record
> which indicates he had any significant
> problems.

(A.R., 813.) At step two, the ALJ also considered any effect Mr.
Arslanian's mild obesity had on his other impairments. (Id.) The
ALJ found no evidence of a quantifiable impact, but nonetheless
took obesity into account when determining Mr. Arslanian's
physical residual functional capacity. (Id.)

At step three, the ALJ determined that Mr. Arslanian did not
have an impairment that met or medically equaled the severity of
one of the listed impairments in 20 C.F.R. Part 404, Subpart P,
Appendix 1. (A.R., 814.) Mr. Arslanian's disorders of the spine
did not meet Listing 1.04, according to the ALJ, because the record
does not demonstrate compromise of a nerve root or the spinal cord,
with additional evidence of nerve root compression; or spinal
arachnoiditis; or lumbar spinal stenosis resulting in
pseudoclaudication, resulting in inability to ambulate
effectively. (Id.)

The ALJ also found that the severity of Mr. Arslanian's mental
impairments, considered singly and in combination, did not meet or
medically equal the criteria of listings 12.04 and 12.06. (A.R.,

814.) The ALJ's decision was based on the failure to satisfy the "paragraph B" criteria of the listings. (Id.) To satisfy the "paragraph B" criteria, the mental impairments must result in at least one extreme or two marked limitations in a broad area of functioning which are: understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; or adapting or managing themselves. (A.R., 814.) Mr. Arslanian suffered only moderate limitations in any of these areas. (A.R., 814-15.) Further, Mr. Arslanian did not meet the alternative "paragraph C" criteria because he had more than a minimal capacity to adapt to changes in the environment or to meet the demands of his daily life. (A.R., 815.)

At step four, the ALJ defined Plaintiff's RFC as follows:

> the claimant had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except the claimant is limited to no climbing of ladders, ropes or scaffolds; occasional balancing, crouching, crawling, stooping, bending, and kneeling; occasional climbing stairs or ramps; and no exposure to unprotected heights, dangerous or moving machinery and machine parts. In addition, the claimant is capable of work with simple, routine, and repetitive instructions in low stress jobs which are jobs that I define as goal oriented and not done at an assembly line or at a production quota pace, a job in which the individual is limited to occasional decision making, occasional changes of workplace setting and occasional changes to workplace routine, and a job in which he has only occasional contacts with supervisors, co-workers, and customers.

18

(A.R., 815-16.) In making this decision, the ALJ first considered Tara Arslanian's testimony about her husband. (A.R., 816.) She testified that Mr. Arslanian had a good work ethic but started to show signs of extreme lethargy, memory deficits, disequilibrium, and slurred speech. (Id.) After a CT scan showed lesions on his brain, he underwent brain surgery and was diagnosed with ADEM. (Id.) According to his wife, his symptoms included personality change, loss of dexterity, no impulse control, and psychotic episodes. (Id.) He underwent occupational therapy but never fully recovered. (Id.) He unsuccessfully tried to return to work and later died of cardiac arrest associated with his brain condition. (Id.)

After consideration of the evidence in the record, the ALJ found that the alleged severity of Mr. Arslanian's symptoms was not entirely consistent with the evidence. (Id.) First, regarding his back impairment and osteopenia, diagnostic imaging showed no significant abnormalities, but rather mild degenerative changes including tiny disc osteophyte complex at L4-L5, and facet degeneration. (A.R., 817.) Mr. Arslanian's back pain was treated with medications including Tramadol, cyclobenzaprine, Ibuprofen and physical therapy, and surgery was not recommended. (Id.) His treatment was conservative. (Id.) Days before his death, Mr. Arslanian was examined for back pain, and he exhibited tenderness and restricted range of motion with mild to moderate antalgic gait,

19

but he had normal muscle strength, sensation, and tone in all extremities. (A.R., 817.)

Second, the ALJ evaluated evidence of Plaintiff's mental impairments including depression, anxiety, stress, and sleep disturbance. (A.R., 817.) During his mental status examinations, Mr. Arslanian was generally noted to be pleasant, alert, and oriented. (Id.) His mood, affect, speech, judgment, insight, remote and recent memory, concentration, fund of knowledge and capacity for sustained mental activity all appeared normal. (Id.)

Mr. Arslanian's mental impairments were treated with Trazodone, Seroquel, and Cymbalta, and he admitted instances of medication non-compliance. (Id.) When compliant, he acknowledged that his medications helped his mood. (Id.) But in May 2014, Mr. Arslanian attempted suicide. (Id.) And then in January 2016, he was hospitalized for complaints of suicidal ideation. (Id.) He admitted that he had been noncompliant with his medication. (Id.) Despite his depressed mood, he was alert, fully oriented, adequately groomed, well-nourished, with good eye contact, calm behavior, normal attention to conversation, fair memory, coherent thought processes, and average intellectual functioning. (Id.) He had, on other occasions, denied depression, anxiety, memory loss, sleep disturbances, paranoia, and suicidal ideations. (Id.) The ALJ also noted that Mr. Arslanian had a history of polysubstance abuse, with both periods of sobriety and relapses throughout the

relevant time period. (A.R., 817.) Thus, at step four of the evaluation process, the ALJ concluded that Mr. Arslanian could not perform any of his past relevant work. (Id.)

At step five, the ALJ considered Mr. Arslanian's age, education, work experience and residual functional capacity, and determined that there were jobs that existed in significant numbers in the national economy that Mr. Arslanian could have performed, and he was, therefore, not disabled. (A.R., 819.) Based on the VE's testimony, the ALJ found that Mr. Arslanian could perform the jobs of "merchandise maker," "routing clerk," and "solderer-dipper." (A.R. 32, 819.)

IV. DISCUSSION

    A.    The Parties' Arguments

Plaintiff argues that the ALJ failed to consider the medical records that were timely submitted after the hearing. (Appellant's Brief, Dkt. No. 11 at 2.) This argument can be quickly disposed of because the ALJ cited to evidence submitted after the hearing in his decision, Exhibits 1F-5F. (A.R., 813-17.) Next, Plaintiff alleges the ALJ erred at step two of the disability evaluation, that Mr. Arslanian's brain impairment was not a severe impairment. (Id.) Further, Plaintiff contends Mr. Arslanian's brain impairment caused severe functional limitations that the ALJ failed to include in his residual functional capacity assessment, and that his brain disorder led to his death. (Id.)

In response, the Commissioner submits that substantial evidence supports the ALJ's determination that Mr. Arslanian did not suffer more than minimal limitations from ADEM for the twelve-month durational requirement for a severe impairment at step two of the disability evaluation. (Def's Brief, Dkt. No. 13 at 14-16.) Additionally, the Commissioner maintains that Plaintiff failed to cite evidence supporting a finding that Mr. Arslanian suffered more than minimal limitations from ADEM for the 12-month durational requirement, and further failed to point to any evidence that the ALJ had failed to consider. ((Def's Brief, Dkt. No. 13 at 16.)

In Plaintiff's reply brief, she counters that Mr. Arslanian was disabled by the combination of his severe back pain and symptoms caused by ADEM. (Appellant's Reply Brief, Dkt. No. 13.) Plaintiff relies on Mr. Arslanian's subjective complaints of back pain, his treatment for back pain, and objective medical findings of back impairments. (Id. at 24-26.) Plaintiff also argues that ADEM was a severe impairment that met the durational requirement, pointing to post-surgical findings of encephalomalacia, and subjective complaints including seizures, mood swings, poor cognition, headaches, double vision, photosensitivity, and lack of coordination. (Id. at 26-30.) Plaintiff hypothesizes that after eight years of sobriety, ADEM caused Mr. Arslanian to make poor choices such as resuming drug use, which caused his deep depression and downward spiral. (Id. at 30.)

22

B.    <u>Whether ADEM Was a Severe Impairment</u>

Within the framework of the disability evaluation process, for an impairment to be medically severe at step two, the impairment or combination of impairments must meet the duration requirement in 20 C.F.R. § 404.1509 — that is — the impairment is expected to last for a continuous twelve months or expected to result in death. 20 C.F.R. § 404.1520(a)(4)(h)(2); § 404.1509. The ALJ relied on the following evidence in finding that ADEM did not meet the durational requirement. (<u>See</u> A.R., 813.) In February 2014, Dr. Alam, Mr. Arslanian's neurosurgeon at Jefferson Hospital, opined that he did not require any more workup or treatment for ADEM. In December 2015, his brain imaging showed no evidence of an acute hemorrhage, midline shift, mass effect, or extra-axial fluid collection. There is only one documented episode of seizures and no evidence that seizures caused significant limitations.

Plaintiff argues that when Mr. Arslanian was discharged from the hospital in December 2013, he continued to suffer severe neurological limitations. (Appellant's Reply Brief, Dkt. No. 14 at 10.) Plaintiff also notes that, if Mr. Arslanian continued to have relapsing episodes, multiple sclerosis was considered a differential diagnosis. (<u>Id.</u>) Plaintiff also challenges the ALJ's reliance on Dr. Alam's February 4, 2014 statement to Dr. Lawyer,

because Dr. Alam did not rely on any objective testing at that time. (Appellant's Reply Brief, Dkt. No. 14 at 11.)

Indeed, Mr. Arslanian had not regained his prior level of functioning when he was discharged from Jefferson Hospital in December 2013. He had residual deficits in cognition (memory, attention, safety awareness, orientation), balance, and coordination. (A.R., 15, 426.) Dr. Lawyer's note, written in February 2014 concerning his discussion with Dr. Alam, reads as follows:

> Dr. Alam, who states that she saw the patient in her clinic last week,[6] and she had cleared him from her standpoint. He completed a full course of steroids for his ADEM, and she feels he won't require any more workup or treatment from her standpoint, and her examination was benign at that time in the clinic.

(A.R., 1121-22.)

Dr. Alam did not feel Plaintiff continued to suffer from ADEM based on her last visit with him, but that is not the end of the analysis. Plaintiff must point to evidence in the record that ADEM caused him to suffer more than minimal limitations at least through November 30, 2014, a continuous 12-months from the onset date of November 30, 2013.

---

[6] The Court is unable to locate a medical record of Mr. Arslanian's visit with Dr. Alam in her clinic the week prior to February 4, 2014.

Mr. Arslanian was never diagnosed with a relapse of ADEM, nor was he diagnosed with multiple sclerosis. Six months after his ADEM episode, in June 2014, his MRI showed "near complete resolution of the hypoattenuating lesions seen previously" with only mild hypoattentuation in the white matter of the cerebral hemispheres (A.R., 642-43, 668-69.) The following month, another MRI confirmed that there were no "acute findings or adverse change" since the previous MRI. (A.R., 564-65.)

Plaintiff also relies on Mr. Arslanian's December 2015 brain scan, which showed encephalomalacia and very subtle hypoattenuation, and the examining physician opined that continued symptoms would warrant a follow up exam. Hypoattenuation "describes areas on an x-ray or CT scan that show up as whiter or brighter than normal."[7] However, the encephalomalacia was unchanged from the prior exam, and, significantly, hypoattenuation was possibly due to artifact and was not seen on later scans. There is no diagnosis in the record of an ADEM relapse. Although Plaintiff testified that the medical examiner told her that her husband's death was associated with ADEM, his death certificate does not bear this out (A.R., 865), and the physician in the hospital where he died associated his cardiac arrest with overdose. (A.R., 1268.)

---

[7] National Center for Biotechnology information, MedGen, available at https://www.ncbi.nlm.nih.gov/medgen/905594.

Plaintiff refers to instances when Mr. Arslanian reported symptoms consistent with ADEM after he was discharged from Jefferson Hospital on December 16, 2013. However, on each occasion, there were other possible causes of his symptoms. For example, on June 10, 2014, when Mr. Arslanian reported symptoms of headaches, light sensitivity, hallucinations, and unsteady gait, Dr. Nicole Mahd opined that Mr. Arslanian's symptoms could be caused by his new psychiatric medications and the fact that he stopped taking suboxone. (A.R., 648.) While Dr. Mahd recommended follow up with Dr. Alam, there are no records indicating that Mr. Arslanian followed up with Dr. Alam as recommended. Throughout 2014 and 2015, Mr. Arslanian did not complain of or exhibit limitations in memory, attention, orientation, coordination, or gait. (A.R., 1128-29, 1137-1140, 1142-1144, 1161, 1164-66, 1170, 1173, 1176-1178, 1184, 1189-90, 1192, 1195, 1198, 1221-22, 1231, 1233-34, 1236.)

Mr. Arslanian suffered only one seizure after his episode of ADEM (A.R., 631-34, 1143), and one episode of double vision. (A.R., 631-34, 1143.) When Plaintiff went to a hospital for treatment of his headache on December 21, 2015, his MRI showed stable post-surgical changes, but very subtle hypoattenuation, which was possibly an artifact of no consequence. (A.R., 1149.) He left the hospital without waiting for a diagnosis or treatment. (A.R., 1148.) On January 20, 2016, he went to a hospital because he was feeling suicidal and complained of chronic headaches and "the

shakes" but the attending physician's initial impression was of substance abuse with potential for withdrawal symptoms. (A.R., 1241-44.) Even assuming these symptoms were caused by ADEM and its residual effects, these infrequent episodes accompanied by normal mental status examinations are consistent with the ALJ's determination that ADEM did not cause more than minimal limitations for the 12-month durational requirement. See Bordeaux v. Barnhart, 43 F. App'x 481, 482 (3d Cir. 2002) (finding single episode of moderate depression did not meet durational requirement for severe impairment).

Plaintiff, however, further contends that Mr. Arslanian's worsening depression and anxiety were caused by ADEM and resulted in his downward spiral. None of Mr. Arslanian's treating medical professionals attributed his depression or anxiety to brain injury, and the ALJ found that, while not symptoms of ADEM, Mr. Arslanian's depression and anxiety were severe impairments themselves. Moreover, the ALJ found that ADEM was a medically determinable impairment, which he took into account in determining RFC, which renders any failure to include ADEM as a severe impairment harmless error. (See ALJ Decision Finding No. 5 at A.R., 815-816); 20 C.F.R. §§ 1545, 1520(e) (residual functional capacity must take into account limitations from severe impairments and medically determinable impairments that are not severe); Salles v. Comm'r of Soc. Sec., 229 F. App'x 140, 145 (3d Cir. 2007) ("Because

the ALJ found in Salles's favor at Step Two, even if he had erroneously concluded that some of her other impairments were non-severe, any error was harmless") (citing Rutherford v. Barnhart, 399 F.3d 546, 553 (3d Cir. 2005)).

Plaintiff has not argued that he meets or equals a listed impairment at step three, therefore, the next issue is whether substantial evidence supports the ALJ's RFC finding.

C.    Whether the Combination of Physical and Mental Impairments Resulted in Disability

Plaintiff maintains that Mr. Arslanian's physical and mental impairments caused marked and extreme limitations in his residual functional capacity. (Appellant's Brief, Dkt. No. 11 at 2; Appellant's Reply Brief, Dkt. No. 14 at 23.) Plaintiff relies on evidence of his treatment for back pain, caused by degenerative changes in his lumbar spine, and evidence of his depression, particularly his suicide attempts. (Appellant's Reply Brief, Dkt. No. 14 at 24-30.)

However, the objective medical findings and Mr. Arslanian's conservative treatment for his low back impairment are consistent with moderate physical limitations, as found by the ALJ. His February 2014 lumber spine x-rays showed mild degenerative changes. (A.R., 1215-16.) Later, on November 5, 2015, the MRI of his lumbar spine showed facet degeneration and a tiny osteophyte complex. (A.R., 1206.)

Although Mr. Arslanian complained of severe back pain, objectively, his symptoms and treatment were consistent with moderate impairments. For instance, when Mr. Arslanian sought treatment for back pain on February 4, 2014, he could walk without difficulty and he denied weakness, numbness, tingling and sciatica. (A.R., 1121-22.) He was treated with steroids and a Lidoderm patch. (A.R., 1123.) The next month, he stated that his back was feeling better after having started gabapentin, but he felt best when prescribed Xanax. (A.R., 1191.) In May 2015, it was recommended that he perform back exercises. (A.R., 1162.) In July 2015, he reported that when he ran out of Tramadol, he felt like he was having withdrawal symptoms, and Dr. Kernis feared he was addicted. (A.R., 1175-77.) Several days after treatment with Tramadol and Toradol in November 2015, he denied muscle spasms, and his back examination was normal, with the exception of some tenderness. (A.R., 1124, 1128.) Later that month, his pain was minimal upon discharge after treatment with Tramadol and Toradol. (A.R., 1137-40.) On December 14, 2015, Mr. Arslanian returned to the hospital for his usual treatment and denied any changes or increases in pain, and the examining physician noted there were no neurological deficits or complaints. (A.R., 1146.) Significantly, in March 2016, Dr. Medvedovsky opined that Mr. Arslanian's back pain might improve if he could be more active. (A.R., 1258.) The ALJ's determination that Mr. Arslanian could perform a limited

range of light exertional work is supported by this substantial evidence in the record. See Louis v. Commissioner of Social Security, 808 F. App'x 114, 119 (3d Cir. 2020) (ALJ's physical RFC based on limitations from degenerative disc disease was supported by evidence of pain relief with conservative treatment); Burns v. Barnhart, 312 F.3d 113, 130 (3d Cir. 2002) (the lack of medical evidence or medical opinion supporting the claimant's subjective physical limitations from chronic back pain supported ALJ's negative credibility finding).

Next, Plaintiff challenges the ALJ's mental RFC determination, arguing that his mental impairments, particularly his depression, as evidenced by his suicide attempts, caused marked and extreme limitations in his functioning. The Court notes that the basic mental functions necessary for work activities include understanding, remembering, and carrying out instructions, and responding appropriately to supervision, coworkers, and work pressures in a work setting. 20 C.F.R. §§ 416.945(c), 404.1545(c). The ALJ determined that Mr. Arslanian had the mental capacity to perform work with

> simple, routine, and repetitive instructions
> in low stress jobs which are jobs that I define
> as goal oriented and not done at an assembly
> line or at a production quota pace, a job in
> which the individual is limited to occasional
> decision making, occasional changes of
> workplace setting and occasional changes to
> workplace routine, and a job in which he has

> only occasional contacts with supervisors, co-
> workers, and customers.

(A.R., 816.)

The ALJ's mental RFC determination is supported by the following evidence in the record. On February 2, 2014, Mr. Arslanian did not report any depression or anxiety. (A.R., 1198-99.) On July 17, 2014, he denied any psychological symptoms. (A.R., 1176.) There are no medical records from a treating mental health professional. Despite his later diagnosis and treatment for depression and anxiety, in nearly all of his mental status examinations, Mr. Arslanian was found to be pleasant, alert, oriented, and his mood, affect, speech, judgment, insight, remote and recent memory, and concentration were normal, and when specifically tested, his fund of knowledge and capacity for sustained mental activity appeared normal. (A.R., 1128, 1143, 1166, 1170, 1184, 1192, 1258.)

Mr. Arslanian's mental impairments were treated with Trazodone, Seroquel, and Cymbalta, and he admitted instances of medication non-compliance. (A.R., 1241, 1164.) When compliant, he acknowledged that his medications helped his mood. (A.R., 1239.) Medical records pertaining to his unsuccessful suicide attempt with a gun that jammed, and records of medical treatment after he drove into a telephone pole at 60 mph, were not submitted for the administrative record, but these incidents were mentioned by Mr.

Arslanian while seeking treatment on other occasions. Remarkably, Mr. Arslanian reported in January 2016, that he had been involved in over 20 motor vehicle accidents, many of which were due to substance abuse. (A.R., 1222, 1239-1240.)

On January 20, 2016, Mr. Arslanian was hospitalized for complaints of suicidal ideation. (A.R., 1239-41.) He admitted that he had been noncompliant with taking Seroquel and Cymbalta because he ran out of medication, but these medications had been helpful for his mood. (Id.) At that time, Mr. Arslanian feared he would soon be sentenced to prison for five to ten years for burglary, which he did not remember committing. (A.R., 1222, 1240.) He attributed his loss of memory to being "high on Xanax." (A.R., 1240.) His divorce, and unemployment were also current stressors. (A.R., 1236.)

Objective medical evidence does not support Plaintiff's contention that his depression and downward spiral were caused by ADEM. Instead, evidence of his normal mental status examinations, improvement with medication, and declines associated with substance abuse, and psychiatric medication noncompliance supports the ALJ's determination that Mr. Arslanin retained the mental capacity to perform simple, repetitive work, in a low stress, low production job, with only occasional contacts with others. See Sutherland v. Comm'r Soc. Sec., 785 F. App'x 921, 929 (3d Cir. 2019) ("ALJ's conclusion that [the claimant] can return to work,

even though it may require medical compliance, is supported by substantial evidence"); <u>Phillips v. Comm'r of Soc. Sec.</u>, 276 F. App'x 219, 222 (3d Cir. 2008) (evidence of coherent, logical thought process, lack of memory and concentration deficits, average intellectual functioning and adequate judgment supported ALJ's finding of mental capacity to do work.) Therefore, the ALJ's RFC determination was supported by substantial evidence in the record.

    D.    <u>Whether the Commissioner Erred by Relying Upon Medical-Vocational Guidelines</u>

Plaintiff asserts that the Commissioner failed to establish alternate work available in the national economy at step five because he erroneously relied upon medical-vocational guidelines ("the Grids") as a frame of reference where Mr. Arslanian had a severe non-exertional impairment and an inability to perform a full range of light work. (Appellant's Reply Brief, Dkt. No. 14 at 22.) Further, Plaintiff contends the ALJ erred by relying upon improper vocational testimony as to transferability of job skills, as stated in <u>Wallace v. Secretary of Health and Human Services</u>, 722 F.2d 1150 (3d Cir. 1984). (<u>Id.</u>)

These issues were raised for the first time in Plaintiff's reply brief, depriving the Commissioner of an opportunity to respond. "A moving party may not raise new issues and present new factual materials in a reply brief that it should have raised in

its initial brief." D'Alessandro v. Bugler Tobacco Co., No. CIV A 05-5051 JBS, 2007 WL 130798, at *2 (D.N.J. Jan. 12, 2007) (citing International Raw Materials, Ltd. v. Stauffer Chem. Co., 978 F.2d 1318, 1327 n. 11 (3d Cir.1992) (refusing to consider an issue raised for the first time in a reply brief); see also Lucas v. Barnhart, 184 F. App'x 204, 206 n.1 (3d Cir. 2006); Kost v. Kozakiewicz, 1 F.3d 176, 182 (3d Cir. 1993). For this reason, Plaintiff's claim fails. Alternatively, this arguments fails on the merits. Referring to the Grids solely as a frame of reference, while still obtaining vocational expert testimony, has never been found to constitute error. See Washington, 756 F.2d at 967–68 (3d Cir. 1985) ("We need not resolve the merits of this "framework" approach as a general matter, because, given the Secretary's failure to present any evidence of Washington's ability to work independent of the prescriptions of the grids, a finding that appellant was not disabled is simply contrary to this Court's precedent"); Sykes v. Apfel, 228 F.3d 259, 274 n.17 (3d Cir. 2000) ("*Washington* explicitly leaves open the possibility that the Commissioner may use the grids as a framework in meeting the step-five burden for a claimant with exertional and nonexertional impairments"); Hall v. Comm'r of Soc. Sec., 218 F. App'x 212, 216 (3d Cir. 2007) (citing 20 C.F.R. § 404.1569a(d)) ("where the limitations imposed by a claimant's impairments and related symptoms affect the ability to meet both the strength demands and

non-strength demands of jobs, the grids will not apply to direct a conclusion as to disability, but will be used solely as a framework to guide the disability decision".)) Here, although the ALJ stated that he referred to the Grids, 20 C.F.R. 404, Subpart P, Appendix 2 as a frame of reference, he also obtained and relied on vocational expert testimony that was based on Plaintiff's properly determined RFC, as required by 20 C.F.R. §§ 404.1545, 416.945. Obtaining vocational expert testimony, as the ALJ did here, is what is required by the cases cited by Plaintiff, Washington v. Heckler, 756 F.2d 959, 968 (3d Cir. 1985) and Santise v. Schweiker, 686 F.2d 925, 935. (3d Cir. 1982).

Plaintiff also claims that the ALJ erred by relying on improper vocational testimony as to transferable skills. The ALJ, by reference to the Grids as a framework, determined that it was immaterial whether Plaintiff had transferable job skills or not because, either way, the Grids directed a finding of not disabled. (A.R., 819.) Wallace, relied on by Plaintiff, is distinguishable because the claimant would have been considered disabled under the Grids if she did not have transferable job skills. 722 F.2d at 1156. While the ALJ erred by relying on the Grids alone for materiality of transferable skills, the error is harmless because the Commissioner "can find younger individuals not disabled so long as they can perform unskilled work." Terry v. Sullivan, 903 F.2d 1273, 1275 (9th Cir. 1990) (citing 20 C.F.R. § 404.1565(a)).

Transferability of job skills is not an issue if an ALJ finds a younger claimant can perform only unskilled work. See 20 C.F.R. § 404.1563(c) ("If you are a younger person (under age 50), we generally do not consider that your age will seriously affect your ability to adjust to other work"); 20 C.F.R. § 404.1565(a) ("If you cannot use your skills in other skilled or semi-skilled work, we will consider your work background the same as unskilled"); Social Security Ruling ("SSR") 82-41, 1982 WL 31389 ("[E]ven if it is determined that there are no transferable skills, a finding of "not disabled" may be based on the ability to do unskilled work"); Cf. Barnes v. Berryhill, 895 F.3d 702, 705 (9th Cir. 2018) ("The issue of skills and their transferability therefore needed to be decided before the ALJ could find Barnes not disabled based on his ability to perform **semi-skilled work**") (emphasis added).

In the Social Security disability context, younger individuals are persons aged 18 to 49. 20 C.F.R. § 404.1563; 416.963. Mr. Arslanian was 38 years old on the alleged disability onset date. (A.R., 818.) The jobs identified by the VE in response to the ALJ's hypothetical question containing Mr. Arslanian's age, education, work experience and RFC were unskilled jobs, with an SVP of 2. (Id.) Oldenburgh v. Astrue, No. 1:08-CV-1671, 2009 WL 812010, at *4 (M.D. Pa. Mar. 26, 2009) (citing Dictionary of Occupational Titles, Appendix C) ("A job is unskilled if it has a Specific Vocational Preparation (SVP) level of 2 or less … To

36

perform a job that is classified as SVP 3 and above, the individual must have the necessary skills to do so.") Further, the VE stated that her testimony of the jobs someone with Mr. Arslanian's characteristics could perform in the national economy was consistent with the Dictionary of Occupational Titles. Zirnsak v. Colvin, 777 F.3d 607, 617 (3d Cir. 2014) (quoting Burns, 312 F.3d at 127 (3d Cir. 2002) ("[A]n ALJ is required to (1) ask, on the record, whether the VE's testimony is consistent with the DOT….") Therefore, the ALJ carried his burden at step five of the disability evaluation process, and the Court will affirm the Commissioner's decision.

V. CONCLUSION

For the aforementioned reasons, the Court affirms the Commissioner's decision. An appropriate Order shall issue.

**Date:  <u>October 26, 2020</u>**

<u>s/Renée Marie Bumb</u>
**RENÉE MARIE BUMB**
**UNITED STATES DISTRICT JUDGE**